# IN THE COURT OF APPEALS
## OF THE
## STATE OF MISSISSIPPI
### NO. 96-CA-00070 COA

*MISSISSIPPI POWER & LIGHT COMPANY*

*v.*

*MISSISSIPPI STATE TAX COMMISSION*

| | |
|---|---|
| DATE OF JUDGMENT: | 01/10/96 |
| TRIAL JUDGE: | HON. STUART ROBINSON |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | DAVID B. GRISHMAN |
| | MICHAEL T. DAWKINS |
| ATTORNEYS FOR APPELLEE: | BOBBY R. LONG |
| | GARY W. STRINGER |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES (OTHER THAN WORKER'S COMPENSATION) |
| DISPOSITION: | AFFIRMED - 8/26/97 |
| MOTION FOR REHEARING FILED: | 9/9/97 |
| CERTIORARI FILED: | 11/25/97 |
| MANDATE ISSUED: | 4/1/98 |

**BEFORE McMILLIN, P.J., KING AND SOUTHWICK, JJ.**

**McMILLIN, P.J., FOR THE COURT:**

¶1. This is a case involving the proper interpretation of this state's franchise tax laws. Mississippi Power and Light (hereafter "MP&L") sought unsuccessfully to have the Mississippi Tax Commission remove certain accounts from consideration in computing the book value of the company's capital -- the basis upon which the franchise tax is levied. MP&L appealed to the Chancery Court of Hinds County, which sits as an intermediate appellate court in such matters. That court affirmed the commission in part and reversed in part. Both MP&L and the commission were dissatisfied with the chancery court's determination, and the matter is now before us on a direct appeal by MP&L and cross-appeal by the tax commission. For reasons which we will now proceed to set out, we affirm the chancery court decision.

# I.

## General Background

### A.

### The Franchise Tax Law

¶2. The Mississippi Legislature imposes a tax on all corporations doing business in this state, called a franchise tax, which is computed on the capital of the corporation. *See* Miss. Code Ann. §  27-13-5 (1972). Rather than basing this tax on the actual value of the capital, as in the ad valorem taxes levied and collected by counties and municipalities, the Legislature chose to base the franchise tax on the value of collateral as reflected in the financial books and records of the corporations themselves. *See* Miss. Code Ann. § 27-13-5 (1972).

¶3. The concept of the tax seems simple, but it is deceptively so. Because there are no absolute laws of accountancy that prescribe with certainty the manner in which a corporation must compile and maintain its financial records, corporations enjoy some degree of latitude in reporting their financial situation. As a result, there have arisen, in the years since the adoption of this taxing scheme, a number of disputes concerning whether certain accounts carried on the financial records of the corporation should or should not be considered in determining "capital" for purposes of calculating the base against which to assess the tax. We deal with such a dispute in this case.

¶4. The franchise tax act itself contemplates that a corporation, for any number of reasons, might maintain its financial records in a manner that would not fairly reflect its capital structure consistent with the spirit of the taxing law. The law, thus, provides that the records of the corporation are deemed prima facie correct unless the chairman of the State Tax Commission (referred to as "the commissioner" in the statute) "determines that the book value does not properly reflect capital. . . ." Miss. Code Ann. § 27-13-11 (1972). In that case, the commissioner's determination of capital is deemed prima facie correct. *Id.* This section provides the commission with the authority to enforce the franchise tax with a reasonable degree of uniformity that would seem essential if the law is to be applied fairly.

### B.

### The Computation of Taxable Capital

¶5. Three particular sections of the franchise tax laws guide us in resolving the issues now before the

Court. The first, section 27-13-5, is informative only to the extent that it explains the broad intent of the law to tax "the value of the capital used, invested or employed in the exercise of any power, privilege or right enjoyed by such organization within this state. . . ." Miss. Code Ann. § 27-13-5 (1972).

¶6. Two subsequent sections, 27-13-9 and 27-13-11, provide the necessary detail to flesh out the broad description of intent contained in section 27-13-5. Section 27-13-9 provides generally that the tax shall be levied against "combined issued and outstanding capital stock, paid-in capital, surplus and retained earnings. . . ." Miss. Code Ann. § 27-13-9 (Supp. 1996 ). As we have observed, section 27-13-11 creates the presumptions that determine whether the balances in these accounts as reflected in the books and records of the corporation will conclusively define the taxable capital base or whether some alternate determination advanced by the commissioner will control. Miss. Code Ann. § 27-13-11 (1972). It is helpful in understanding the issues now before the Court to explore these two code sections in more detail.

¶7. Section 27-13-9 relies heavily upon terms that have no inherent meaning in the law, but derive their meaning from the field of accountancy. The text of that part of the section that concerns us is as follows:

The tax imposed, levied and assessed, under the provisions of this chapter, shall be calculated on the basis of the value of the capital employed in this state for the year preceding the date of filing the return, whether a calendar year, or fiscal year, except where otherwise provided in this chapter, measured by the combined issued and outstanding capital stock, paid-in capital, surplus and retained earnings; provided, that in computing capital, paid-in capital, surplus and retained earnings, there shall be included deferred taxes, deferred gains, deferred income, contingent liabilities and all true reserves, including all reserves other than for definite known fixed liabilities which do not enhance the value of assets; and amounts designated for the payment of dividends shall not be excluded from such calculations until such amounts are definitely and irrevocably placed to the credit of stockholders, subject to withdrawal on demand; provided, however, there shall not be included in the value of the capital stock any sums representing debts, notes, bonds and mortgages due and payable, except where notes or debts due are provided by an affiliated company as a substitute for stock or paid-in capital; nor depreciation reserves, bad debt reserves, nor reserves representing valuation accounts. . . .

Miss. Code Ann. § 27-13-9 (Supp. 1996).

¶8. While the concepts of capital stock, paid-in-capital, and surplus may have some meaning in law based on legal notions of what is required to establish and fund a corporation, the bulk of the terms in this section may be understood only by reference to the field of financial accounting. By way of example, a person contemplating the term "retained earnings" may intuitively grasp the concept in a general sense, but will be unable to fully appreciate its meaning in the sense intended in the statute without consulting the rules of accounting.

¶9. Were we dealing only with an uncomplicated business employing a rudimentary accounting system, our task would not be difficult. At its most fundamental, the theory of accounting is purely logical and, if logically applied, would seem to produce consistent and uniform results. Accounting begins with a basic mathematical formula based on logic, which requires no special training or insight

to understand: The assets of a corporation are equal to the sum of its liabilities and shareholders' equity. Stated using mathematical symbols, it appears as: Assets = Liabilities + Shareholders' Equity. Shareholders' equity has several sub-components consisting, in its simplest form, of (a) the amounts contributed by the shareholders together with (b) corporate earnings that have not been paid out by way of dividends. The accounting equation is necessarily true since a corporation may only acquire assets by one of three means: (1) it may purchase assets with the capital contributed by its shareholders, (2) it may incur debt to purchase items of value, or (3) it may obtain assets using accumulated profits. It must be kept in mind that, in the field of accounting, assets are carried at "book value" rather than actual or market value. Book value is based upon acquisition cost (subject to subsequent modification for factors such as depreciation). Since shareholders' equity represents the total of all capital contributed by shareholders plus all profits earned by the corporation but not distributed to shareholders as dividends, it can be seen that when these sums are combined with all liabilities, the result, by logical necessity, must be equal to the book value of all assets, thus maintaining the balance of the accounting equation.

¶10. Corporations routinely produce records that reflect their financial status at a particular point in time. These reports are termed "financial statements" or "balance sheets," and purport to show, in a somewhat summarized manner, those dollar figures that correspond to the components of the accounting equation. Generally, what is done is that assets and liabilities are summarized into different classes that convey some sense of their nature, and a total dollar figure is reflected in each of these classes. Examples would include such asset accounts as "accounts receivable" or "cash on hand." Liability accounts typically include such entries as "accounts payable," "short term debt," and "long term debt." The third category, shareholders' equity accounts, are handled similarly and consist of such accounts as "paid-in-capital" and related accounts showing direct contributions of shareholders, together with the somewhat unique account styled "retained earnings," which, as we previously observed, represents accumulated profits derived from corporate operations that have not been distributed to shareholders as dividends. These summary accounts are then typically organized in a manner that corresponds to the accounting equation; that is, asset accounts are listed and totalled, followed by similar notations of liabilities and shareholders' equity accounts; all organized in such a way to demonstrate that the total of assets does, in fact, equal the total of liabilities and shareholders' equity.

¶11. The difficulty in cases such as this arises out of the fact that within the field of accountancy, there are different concepts as to how particular financial occurrences ought to be reflected on the corporation's records. In an actual example which led to litigation under the sections we now consider, a closely-held Mississippi corporation refused to show the gain it had made on a sale as an asset on the corporate books because the sale price had been financed by the corporation, and the company contended that the gain would not become an asset until the deferred payments were received. *See Mississippi State Tax Comm'n v. Dyer Inv. Co.*, 507 So. 2d 1287 (Miss. 1987). This position was contrary to the manner in which a publicly-held corporation completing a similar transaction would have been expected to account for the gain on the sale. Litigation ensued when the commission sought to compel the corporation to include the deferred gain as a part of its taxable capital. *Dyer,* 507 So. 2d at 1291. MP&L, in fact, relies on the *Dyer* decision to support its position, and we will, therefore, consider the merits of the case further at a later point in this discussion. Our purpose in mentioning the case now was only to show an actual example of the problems arising out

of lack of uniformity in accounting practices.

¶12. As a result of such potential differences and in an apparent attempt to bring some uniformity to the franchise tax law, section 27-13-9 contains a number of specific instances where, notwithstanding general theories of accounting or the accounting practices employed by a particular corporation, the statute will override and dictate whether a particular account will or will not be permitted as an adjustment when computing the corporation's tax base for the franchise tax. These include requirements that deferred taxes, deferred gains, deferred income, contingent liabilities, and certain reserve accounts be included in the tax base whether or not the particular accounting system used by the corporation so dictates. Additionally, certain other accounts, such as reserves for depreciation and bad debts are statutorily excluded from the computation of capital, effectively ending any debate as to their proper treatment based on accounting principles.

II.

Retained Earnings

¶13. Section 27-13-9 is clear that the retained earnings of a corporation constitute one of the components of capital that is subject to the franchise tax. The account reflecting "retained earnings" is exactly that -- a dollar figure on the financial statement intended to reflect those earnings or profits derived by a corporation in the conduct of its business that have not been distributed to the shareholders as dividends. In considering the computation of retained earnings, however, certain ideas that appear through intuition need to be disabused. There is not necessarily a fund, such as a bank account, which can be readily identified as the "retained earnings" of a corporation. Though it may be helpful in thinking of the concept to consider "retained earnings" as a separate pot of money representing all of the undistributed earnings of the corporation, in reality, this pot of funds typically does not exist. By way of example, a corporation may accumulate profits from operations of $50,000 and use that money to purchase a new piece of equipment. While the purchase may make an earnings dividend to shareholders unlikely, that purchase does nothing to diminish the balance in the retained earnings account. All that has transpired is that the nature of the company's assets has been modified, yet the accounting equation produces exactly the same figure for retained earnings both before and after the purchase.

¶14. In point of fact, the account reflecting a corporation's retained earnings is the account that ensures the accounting equation remains in balance. It is always the figure that remains when a corporation's liabilities and the amount of shareholders' contributions are subtracted from the book value of the corporation's assets. It is the logical, necessary result of applying the principle upon which the accounting equation is based; *i.e.,* if a corporation has assets that exceed the total of its liabilities and the amounts contributed by the shareholders, there is no other possible source for acquisition of such assets except previously undistributed earnings.

¶15. The entry for retained earnings, more so than any other entry in a corporation's financial records, is a figure owing its existence to the accounting equation. The cost of acquiring assets, the exact

amount of a corporation's liabilities, and the amounts that shareholders have contributed into the corporation are all figures that may be, and in fact are, properly determined by reference to sources other than the financial statement. But it is only armed with these figures that the account styled "retained earnings" can be computed. There is no independent source of information by which the amount properly included in this account may be determined. Because "retained earnings" is derived by performing the proper mathematical computations on the other accounts of a corporation, it is, at the theoretical level, impossible to single out any particular account as having some special bearing on the retained earnings account, since *all* other accounts affect the determination of the proper balance in retained earnings. By way of example, an entry recording an amount of depreciation diminishes the book value of an asset. Since that entry neither diminishes the corporation's liabilities nor increases the amount of capital contributed by the shareholders, and since the accounting equation, on principles of simple logic, must remain balanced, the proper entry is to correspondingly diminish retained earnings. Such an entry does not mean that there has been a physical transfer of funds out of some mythical pot where past profits of the corporation have been hoarded. It simply means, that for purposes of accounting -- which has as one of its intended purposes to disclose an accurate picture of the financial condition of the corporation -- a part of corporate earnings that could otherwise be considered uncommitted profit has now been "lost" to the extent that, by accounting standards, the corporation now holds an asset whose value has been diminished by the passage of time. This paper loss is accounted for by a corresponding reduction in the retained earnings account, a transaction that is both logical and serves to keep the accounting equation in balance.

¶16. With this general background in mind, we will now proceed to discuss the particular issue that confronts the Court in this litigation.

III.

Deferred Power Costs

¶17. One of the issues before the Court arises out of the fact that MP&L is a utility company whose rates are regulated by the State of Mississippi acting through the Mississippi Public Service Commission. In the early 1980's, MP&L began to acquire a portion of its electricity from a sister corporation, System Energy Resources, Inc. (hereafter "SERI"). SERI used nuclear-powered generators to produce electricity, and the unit cost of this electricity was substantially higher than electricity generated by alternate, more traditional, means. The Public Service Commission declined to permit MP&L to pass the entire cost of this more expensive electricity through to its customers on a current basis. Ultimately, the issue was resolved by a rate agreement that required MP&L to initially absorb a portion of the cost of the nuclear-generated electricity with the prospect of a graduated rate increase over a period of thirteen years that would eventually permit the company to recover all of the power costs.

¶18. Under the plan, MP&L kept a separate accounting of the difference between (a) the actual cost of the nuclear-generated power incurred in each accounting cycle and (b) the amount that was being

charged to customers in the same cycle. This amount was carried on the books as an account styled "deferred power costs." In addition to the prospect of eventual recovery of these deferred costs through a surcharge, the Public Service Commission accommodated MP&L further by permitting the utility to pass through to its customers on a current basis an item called a "carrying charge." This charge was calculated as a percentage of the outstanding balance in the deferred power cost account. The effect of this carrying charge was to permit the company to cover additional expenses incurred by the company by virtue of the delay in recovering all of its power costs, whether the expense was in the form of interest on necessary borrowing or simply "opportunity costs" resulting from an inability to otherwise deploy funds expended for these presently unrecoverable power costs.

¶19. The parties to this litigation have engaged in a heated dispute as to the effect this deferred power cost account has in determining MP&L's franchise tax obligation. They have, in fact, been unable to even agree on the terminology to discuss the issue. One expert witness for MP&L went so far as to call the account a "negative reserve" account in an attempt to show it was statutorily excluded from the franchise tax calculation -- a concept this Court, untutored in the vagaries of accounting terminology, finds to be equally as true and equally as unenlightening as the idea that a liability is nothing more than a negative asset.

¶20. It is from the mixed bag of statutory language, past court decisions interpreting these statutes, and general principles of accounting that this Court must now proceed to fashion a resolution to this dispute.

IV.

Analysis

¶21. We begin with the plain language of the statute. As the supreme court has observed, "[t]here is no natural law of tax liability." *Mississippi State Tax Comm'n v. Dyer Inv. Co.*, 507 So. 2d at 1290. Limited only by such constitutional concepts as equal protection and due process, the Legislature may levy a tax in any manner it deems advisable. In regard to this franchise tax, we have already observed that section 27-13-9 defines the tax base as consisting of capital stock, paid-in-capital, surplus and retained earnings, with certain statutorily-mandated "overrides" to deal with specific accounting practices that might, depending on the accounting conventions employed by different corporations, result in differing tax obligations for similarly situated businesses. *See* Miss. Code Ann. § 27-13-9 (Supp. 1996). We further observe that section 27-13-11 provides that so long as the commissioner is agreeable, the books of the company are prima facie correct insofar as they define the base against which the State's franchise tax will be assessed. *See* Miss. Code Ann. § 27-13-11 (1972).

¶22. Proceeding next to case law, we learn that, for these purposes, the regularly published balance sheets or financial statements of a corporation are deemed to be the "books" of the corporation within the meaning of sections 27-13-9 and -11. *See Tower Loan, Inc. v. Mississippi State Tax Comm'n*, 662 So. 2d 1077, 1083 (Miss. 1995).

¶23. Armed with this background information, our review of the record in this case demonstrates that MP&L has, for some time, carried the deferred power cost account on its financial statement in such a way that it was essentially treated as an asset, whether so named or not. We observe parenthetically that, in MP&L's published 1987, 1988, and 1989 annual reports, footnotes to the financial statement in the report refer to the account as a "deferred asset."

¶24. Showing the account on its financial statement in this manner results in a corresponding increase in the corporation's retained earnings account since, as assets increase and all else remains equal, the account for retained earnings increases an equal amount.

¶25. At this point in our analysis, it must be conceded that the tax commission has the upper hand. The facts of the case undoubtedly demonstrate that the retained earnings figure published in MP&L's financial statements (to which the deferred power cost account contributed positively) is prima facie correct for purposes of determining the proper franchise tax base. Though it is easy to lose focus, it is important that our attention ultimately remain on the retained earnings account - not the deferred power costs account - since the retained earnings account is the account statutorily dictated to be a part of the taxable capital base of the corporation. It is true that the deferred power account balance is a component of the calculation that produces the balance appearing in the retained earnings account, but that has no more significance than the observation that MP&L's liabilities shown on the financial statement cause a corresponding reduction in the retained earnings account. MP&L's own business records indicate that the deferred power cost account had a positive impact on its retained earnings in each of the years in question. The commissioner accepted that method of reporting retained earnings. Section 27-13-11 necessarily establishes, therefore, that the balance of the retained earnings account is the prima facie correct amount to use in computing the taxable capital base of the corporation.

¶26. Thus, if MP&L is to prevail in this litigation, it must, in effect, overcome a presumption of taxability created by its own accounting records. There appear to be two methods by which this may be accomplished. First, it may be that one of the statutory "overrides" in section 27-13-9 requires the exclusion of the deferred power cost account. Neither party to this litigation makes such an assertion. The second possible avenue is that prior case law would permit MP&L to subtract this account from retained earnings. This is the proposition that MP&L advances.

¶27. More particularly, MP&L places substantial reliance on the 1943 case of *State Tax Commission v. Mississippi Power & Light Company,* 194 Miss. 260, 266, 11 So. 2d 828, 829 (1943), as supporting the idea that this deferred power cost account is nothing more than a bookkeeping entry whose sole purpose is to permit a delay in the realization of a business expense, and, as such, is not a "true asset" within the meaning of the franchise tax statutes. In that case, the supreme court dealt with a situation where MP&L had incurred a number of expenses and costs associated with the issuance of corporate bonds. The bonds were to be repaid over an extended period of years, but the issuing costs were necessarily paid in full in the year the bonds were issued. Such costs are routinely, for accounting purposes, not expensed in full in one accounting period. The different method of accounting for such costs arises out of an accounting concept known as "matching," which, in essence, means that an expense ought to be accounted for in the same accounting period in which the benefit of that expense was obtained. Thus, it is common for issuing costs associated with a bond issue repayable over a number of years to be divided into the same number of segments. The

appropriate fractional part of the issuing cost is then expensed against income in each of the years of the life of the bond issue. Otherwise, according to accounting theory, the year of issuance would present a distorted picture of the financial condition of the corporation. Accounting theory, however, must yield to reality because there is no way to simply ignore the fact that the corporation has, in the year the bonds were issued, incurred the actual outlay of the total expenses. This outlay of corporate cash necessarily causes a decrease in assets of the corporation that would, if no further accounting entries were made, cause the entire expense to be realized in one accounting period. In order to provide against this, it is customary to create an account for the deferred portion of the expense which, for purposes of the financial statement, has the same effect as an asset account. In effect, the deferred expense becomes the "asset" that replaces the part of the issuing costs that will not be expensed against income until future years. This account is then depleted systematically over the life of the bond issue to absorb the appropriate fractional part of the expense in each of the affected accounting periods.

¶28. In the 1943 MP&L case, the supreme court looked at this account and concluded that it was nothing more than a bookkeeping entry and did not, in fact, evidence the existence of "capital" employed in the corporation's business within the meaning of the franchise tax laws. *State Tax Comm'n v. Mississippi Power & Light Co.,* 194 Miss. at 266, 11 So. 2d at 829. The court, in its analysis, seemed to say that, despite the language of the statute referring to "book value," the various components of capital reflected in a company's books would, nevertheless, be subject to taxation under the franchise laws only if the account reflected a "true asset." *Id.*

¶29. MP&L claims in this litigation that the deferred power cost account is essentially the same type of accounting entry as the deferred expense account for the bond issuance costs in the 1943 case since, in both instances, an event has occurred that has actually reduced the "true capital" of the corporation. MP&L's argument continues that, for considerations unrelated to the franchise tax, accounting concepts required a delay in realizing a portion of the capital outlay; however, the accounting entry necessary to delay realizing the entirety of the expense does nothing to alter the fact that this "true capital" is forever gone. Thus, the argument concludes, the removal of this account from consideration more accurately reflects the actual capital position of the corporation.

¶30. MP&L claims that its position is bolstered by the later case of *State Tax Commission v. Dyer Investment Company*, a case we have already mentioned. MP&L relies particularly on the language in the opinion that "[w]e consider that which underlies the label 'undivided profits' [now "retained earnings"] to be limited to sums which have come into possession and control of the taxpayer and which are presently available for division and distribution among the shareholders." *Dyer*, 507 So. 2d at 1291.

¶31. This Court finds both the 1943 MP&L case and the *Dyer* case to be distinguishable from the present litigation. We will consider first the *Dyer* decision.

¶32. The *Dyer* case, at its heart, was simply a dispute over accounting methods. Dyer, a closely-held corporation, had elected an accounting method that permitted the company to delay realizing the gain on the sale of certain assets until the payments from the purchaser were actually received. There was no dispute that, had the company maintained its books under accounting principles that were required of publicly-held corporations (known as "generally accepted accounting principles" or GAAP), the

entire gain on the sale would be reflected as a capital asset of the corporation and thus, subject to the tax. The *Dyer* Court concluded, nevertheless, that the accounting methods employed by Dyer were sufficiently well-accepted for closely-held corporations as to be unobjectionable under the language of section 27-13-11 and, therefore, "prima facie correct" for computing the tax base. *Id.* at 1292; *see also* Miss. Code Ann. § 27-13-11 (1972). The court concluded that the commissioner's statutory authority to dispute a corporation's accounting methods did not extend so far as to permit him to impose an alternate accounting method when the one in use had some reasonable measure of acceptance in the field. *Id.* at 1292. Thus, *Dyer* was actually decided, according to this Court's understanding, on the idea that Dyer's books were "prima facie correct" under section 27-13-11, and the commissioner had failed to overcome that notion. *Id.* Thus, the quoted language relied upon by MP&L appears to be *obiter dictum*. It also appears to be incorrect, since the inclusion or exclusion of the deferred gain depended on the accounting method employed and not on some theoretical conception of whether it was or was not "capital" in an absolute sense.

¶33. We conclude that the presumption arising in favor of the correctness of Dyer's books -- which happened to operate in Dyer's favor -- is the same presumption that works against MP&L in this case. Nothing in the *Dyer* decision, properly construed, offers any support for MP&L's argument for the exclusion of the deferred power cost account.

¶34. We must, therefore, turn to the 1943 MP&L case to determine if it provides support for MP&L's position in this litigation. We conclude that it does not.

¶35. In the 1943 case, the expenses associated with the bond issue were effectively lost to MP&L without prospect of recovery. That situation is substantially different from the present case. While the added expense of the nuclear-generated power has unquestionably been incurred, nevertheless, under MP&L's rate agreement with the Public Service Commission, there is a substantial likelihood that those costs will be recovered in the future. By meticulously accounting for the difference between the costs of the electricity and the portion of the costs passed through to customers during the same accounting period, MP&L has preserved for itself two very valuable rights. First, it has preserved the right to impose a "carrying charge" on its customer base calculated as a percentage of the balance in the deferred power cost account. If MP&L were extending credit to its customers and extracting an interest charge on the deferred balance, that would not be unlike the situation now before the Court, and such a deferred receivable would unquestionably constitute a part of the taxable capital of the business.

¶36. Secondly, MP&L has preserved the right to further surcharge its customers over a period of years an amount sufficient to recover its entire outlay for the nuclear-generated power. Again, this is not unlike a company extending credit to a customer in anticipation of ultimate payment -- a transaction that unquestionably produces a taxable asset. If, in the 1943 case, MP&L had enjoyed the prospect of independently recovering its outlay for bond issuance costs and had reflected this prospect on its accounting records as something in the nature of a future receivable, we have little doubt that the outcome of the case would have been different.

¶37. We conclude that MP&L possesses a right that has sufficient probability of realization that it ought properly to be reflected on its financial statement as an asset for franchise tax purposes. This right, in the nature of an asset, is the privilege that has been extended to MP&L by compact with the

Public Service Commission to add sufficient amounts to customer billings over the life of the agreement to permit full recovery of the initial shortfall between its costs for nuclear-generated power and the amount passed through to its customer base. That this "asset" is of a somewhat unusual nature does nothing to detract from its value to the corporation. Since all asset account balances affect the determination of retained earnings in a positive way, we find nothing in the statute or applicable case law that would suggest any valid reason to permit MP&L to arbitrarily withdraw this account from consideration.

¶38. For these reasons, we conclude that the chancellor was correct in determining that the account constituted an element of the taxable capital, and we affirm his decision on this issue.

V.

The Tax Commission's Cross-Appeal

¶39. The second issue before the Court is the commission's cross-appeal from the chancellor's decision to permit exclusion of certain accounts relating to the bonded indebtedness of MP&L when computing the tax base. MP&L's sister corporation, SERI, is also a party to this cross-appeal, due to an essentially similar dispute over its treatment of certain bond-related accounts on its franchise tax return. The principles guiding our decision in the two consolidated cases are identical.

¶40. All of the accounts in question relate to the manner in which these corporations accounted for one-time capital outlays related to bonded indebtedness. They included matters such as (a) bond issuance costs, (b) less-than-anticipated income from bond sales sold at a discount, and (c) premiums paid to redeem corporate bonds prior to maturity at a cost in excess of the face value of the bonds. In each of these instances, the corporations set up their accounting records in a manner that permitted the depletion in corporate assets occasioned by these transactions to be spread over the life of the bonds. As a result, for reasons we have already discussed, the accounts showing the portion of these one-time outlays that would be written off in future accounting periods caused a corresponding increase in the corporations' retained earnings accounts.

¶41. This Court concludes that these accounts are substantially the equivalent of those addressed in the 1943 MP&L case. Whether arguments contained in the commission's brief on cross-appeal suggest the desirability of re-evaluating the merits of the decision in that case is a question that this Court may not properly consider. When existing precedent is clear, the doctrine of *stare decisis* dictates that we adhere to the precedent. There is no principled basis to distinguish the 1943 case in this instance, and the authority to overrule it rests solely with the Mississippi Supreme Court. The basis for judicially singling out these types of accounts for special treatment in the face of the clear statutory mandates of sections 27-13-9 and 27-13-11 does not appear to this Court with any degree of clarity. Nevertheless, it is crystal clear that the supreme court did just that in 1943, and nothing has transpired in the succeeding fifty-four years that would permit this Court to ignore the holding in that case. On that basis, we affirm the chancellor's judgment regarding the proper procedure for dealing with these bond-related accounts.

¶42. **THE JUDGMENT OF THE CHANCERY COURT OF THE FIRST JUDICIAL DISTRICT OF HINDS COUNTY IS AFFIRMED BOTH AS TO THE APPEAL AND THE CROSS-APPEAL. COSTS OF THE APPEAL ARE TAXED ONE-HALF TO THE APPELLANT/CROSS-APPELLEE, MISSISSIPPI POWER & LIGHT COMPANY AND ONE-HALF TO THE APPELLEE/CROSS-APPELLANT, THE MISSISSIPPI STATE TAX COMMISSION.**

**BRIDGES, C.J., THOMAS, P.J., COLEMAN, DIAZ, HINKEBEIN, KING, PAYNE, AND SOUTHWICK, JJ., CONCUR. HERRING, J., NOT PARTICIPATING.**